UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| CHRISTINE RIVARD, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | No. 1:23-cv-10576-JEK |
| NICE SYSTEMS, INC., | ) ) ) | |
| Defendant. | ) ) | |

**MEMORANDUM AND ORDER ON
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

**KOBICK, J.**

Plaintiff Christine Rivard claims that her former employer, defendant NICE Systems, Inc., violated the Massachusetts Wage Act, M.G.L. c. 149, § 148, by not paying her certain commissions, in the form of incentive payments, allegedly due to her after her resignation from the company. Pending before the Court is NICE's motion for summary judgment, which seeks judgment on the basis that those incentive payments are not subject to the Wage Act. Agreeing with NICE, the Court will grant the motion.

**BACKGROUND**

The following facts are either undisputed or recounted in the light most favorable to Rivard, the non-moving party, where supported by record evidence. *See Dixon-Tribou v. McDonough*, 86 F.4th 453, 458 (1st Cir. 2023).

NICE is in the business of providing cloud and on-premises enterprise software solutions to its customers. ECF 39, ¶ 1. Rivard worked at NICE as a Solution Sales Executive and was responsible for facilitating the sale of NICE's products and services to customers. *Id.* ¶¶ 4, 6.

I.      **The Plan.**

During the time period relevant to this case, NICE operated an incentives program, which was governed by the NICE Ltd. 2021 Sales Incentive Plan – Enterprise & Public Safety (the "Plan"). *Id.* ¶ 8. Under the terms of the Plan, a Participant[1] was a "current employee" "who [wa]s part of the sales organization and [wa]s eligible to participate." *Id.* ¶ 13; ECF 35-4, §§ 3.2, 3.37. To participate, Participants were required to review, acknowledge, and accept the Plan, their individual 2021 Goal Sheet, NICE's Booking Policy, and, if applicable, the Bonus Package. ECF 39, ¶ 11.

The Plan and each Participant's Goal Sheet together determined the timing and amount of incentive payments due to Plan Participants. *Id.* ¶ 10. A Participant's Goal Sheet set out the Participant's annual Quota, or the target sales figures assigned to each Participant. *Id.* ¶¶ 19-20. A Quota consisted of combinations of NICE offerings for sale—also known as Business Models— to be booked by the Participant, for renewal contracts or new contracts. *Id.* ¶ 21. Bookings, which were Orders for at least one Business Model, were issued by NICE's customers and included a payment commitment. *Id.* ¶¶ 17-18. These Bookings were credited against Participants' Booking Quotas to calculate the Participant's Quota Retirement, defined as "'credits a Participant receives against his/her Quota.'" *Id.* ¶¶ 22-23 (quoting ECF 35-4, § 3.41). Participants were then eligible for Incentives, which were rights to payment that were calculated off of Participants' Quota Retirement, based on Orders booked by NICE's customers. *Id.* ¶ 25.

The conditions that had to be satisfied for a Participant to earn an Incentive varied with the type of product booked and were set out in the Participant's Goal Sheet and Exhibit A to the Plan. *Id.* For some products, Participants were eligible to earn Incentives upon Booking. *Id.* ¶ 41. For

---

[1] Capitalized words here are used to denote terms that are defined in the Plan.

others, Incentives were not earned until Invoicing, which occurred according to the contract terms between NICE and its customers. *Id.* ¶¶ 41, 76. And for still others, Incentives were earned in part upon Booking and then in part upon Invoicing. *Id.* ¶ 41. When Incentives were earned based on certain Invoicing milestones set forth in Exhibit A to the Plan, and NICE calculated the entire Incentive upon Booking, the portion of that total that had not yet been earned and would be earned only upon satisfaction of the Exhibit A criteria was deemed an Unearned Incentive. *Id.* ¶¶ 26-27. The Plan also specified that Unearned Incentives would "'not be payable to any Participant unless and until they bec[a]me earned in accordance'" with Exhibit A. *Id.* ¶ 27 (quoting ECF 35-4, at 24).

A Participant's Quota Retirement based on Bookings could be reversed by De-Bookings and Uncollectable Determinations that occurred during the same calendar year as the original Booking. *Id.* ¶ 24. A De-Booking occurred when a Booking was reversed, in whole or in part. *Id.* ¶ 29. An Uncollectible Determination referred to NICE's determination that a sale was "unlikely to be invoiced," or Invoicing was "unlikely to be collected, in whole or in part." *Id.* ¶ 37. The Plan reserved NICE's right to make De-Bookings and Uncollectible Determinations. *Id.* ¶¶ 31, 37; ECF 35-4, §§ 4.6, 4.7. If a De-Booking or Uncollectible Determination was applied to a Participant's Booking, the credit allocated to a Participant's Quota was reduced to account for the loss of value, which, in turn, reduced the value of Incentives for which a Participant was eligible. ECF 39, ¶¶ 24-25, 32, 36-37. And if De-Booking occurred after an entire Incentive had been earned, Incentives and Bonuses calculated for subsequent Bookings would be reduced. *Id.* ¶ 30.

The Plan specified that "[i]f a Participant's employment ends for any reason, then participation in the Plan will terminate as of the last day of employment," with any Incentives and Bonuses "calculated based upon Bookings and Invoicings through the last day of Plan participation." *Id.* ¶¶ 38-39; ECF 35-4, §§ 10.5.1, 10.5.2. It further specified that, "[f]or the

3

avoidance of doubt, Participants shall not earn any Incentives or Bonuses following termination from an Employer." ECF 39, ¶ 39; ECF 35-4, § 10.5.2.

## II.     Rivard's Tenure at NICE.

Rivard worked at NICE as a Solution Sales Executive until her resignation on December 30, 2021. ECF 39, ¶¶ 4, 52. In that role, she was eligible to earn Incentives as a Participant in the Plan. *Id.* ¶¶ 7-8. In March 2021, she accepted the terms of the Plan and her 2021 Goal Sheet, which made her eligible for Incentives for five Business Models. *Id.* ¶¶ 12, 40.

Rivard's job duties as a Solution Sales Executive included facilitating sales of NICE's products and services to its clients to achieve Bookings. *Id.* ¶ 6. The Plan also imposed on her certain responsibilities after NICE accepted Purchase Orders, including helping to resolve customer issues before customers made their payments to NICE. *Id.* ¶ 15. Rivard and NICE disagree over the extent of her duties between Booking and Invoicing, but they agree that Rivard had some responsibilities during that period. *See id.* ¶ 44; ECF 39-2, at 43-44, 77, 127-29; ECF 35-2, ¶ 7. Rivard's supervisor, Regional Vice President of Solution Sales David Taliancich, averred that all of his Solution Sales Executive supervisees in 2021, including Rivard, "were expected to perform work responsibilities relating to a sale between the dates of 'Booking' and 'Invoicing' of those sales," including "collaborating with NICE coworkers to address any questions or concerns that the customer raised with respect to the product that had been sold to the customer." ECF 35-2, ¶ 7. Post-Booking duties included participating in transition calls between NICE's sales and services teams concerning "conversations the sales team had with customers regarding the scope of a NICE solution, implementation timing, and customer expectations," as well as "supporting implementation kick-off meetings, leading demonstrations of the solution that a customer had purchased, and supporting NICE account executives through the delivery of a solution." *Id.* ¶ 8.

4

According to Rivard, this transitional period would typically last just two weeks, though it was "possible" that it could take longer. ECF 39-2, at 47-48.

Rivard also worked to avoid De-Bookings following Bookings. ECF 35-2, ¶ 9. Taliancich averred that after booking a sale, Solution Sales Executives "would partner with the Direct Sales Account Team, Product Group, and Professional Services Team to do all that they could to prevent 'De-Booking,'" including by "understanding the specific circumstances leading to the customer wanting to De-Book, ensuring that the customer understood the implications of De-Booking, and trying to convince customers not to De-Book." *Id.* At her deposition, Rivard characterized this as a "probably minimal" duty for a Solution Sales Executive, noting that avoiding De-Booking "ultimately . . . was the account executive's responsibility." ECF 39-2, at 43-44, 77-78. She admitted, however, that should the threat of a De-Booking arise, she would "attend meetings, understand the impact of the decisions that [customers were] making, and the overall solution and impact to the use case that they identified," and that she would try to convince the customers not to De-Book. *Id.* at 44, 77. On at least one occasion, Rivard actively worked to prevent a De-Booking that threatened a deal with Ultimate Software Group that had been booked months beforehand. ECF 39, ¶ 51; *see* ECF 39-2, at 106, 110-13 (describing her work to avoid a De-Booking, which included "helping behind the scenes . . . trying to keep this active").

Rivard resigned from NICE on December 30, 2021. ECF 39, ¶ 52. At that time, she had Unearned Incentives totaling $53,840.57 for four categories of Business Models that she had booked and for which full Invoicing had not yet occurred: (1) Products, (2) One Time Professional Services; (3) Initial Maintenance; and (4) Recurring Services. *Id.* ¶¶ 54, 64, 68; ECF 51, at 2. The Plan set out different conditions for earning Incentives for these Business Models. ECF 39, ¶ 41. For the Products and Initial Maintenance Business Models, Rivard was eligible to earn 50% of the

total calculated Incentives on the Booking date; the remaining 50% was earned on the date Invoicing occurred. *Id.* ¶¶ 59-62. For One Time Professional Services, Rivard earned proportional amounts of her available Incentives upon each Invoicing sent to the customer, up to 100% of the Booking value. *Id.* ¶¶ 55-56. And for Recurring Services, Rivard earned 50% of the total calculated Incentive on the Booking date and then the applicable percentage of the total calculated Incentive that each Invoicing bore to the total Invoicing due. *Id.* ¶¶ 57-58. Rivard contends that she is entitled to the full value of the Unearned Incentives that were pending as of her resignation; NICE disagrees and contends that she is not entitled under the Plan to these pending Unearned Incentives. *Id.* ¶ 53.

### III.    Procedural History.

On November 23, 2022, Rivard filed suit against NICE in Essex Superior Court, alleging a violation of the Massachusetts Wage Act, M.G.L. c. 149, § 148, with respect to NICE's failure to pay her Unearned Incentives after she left the company. ECF 1-1, at 6-9. After it was served with the complaint on February 13, 2023, NICE removed the case to this Court on March 15, 2023, invoking diversity jurisdiction. ECF 1, ¶¶ 2, 6-7. Following the Court's denial of NICE's motion to dismiss, ECF 17, the parties conducted discovery and NICE moved for summary judgment, ECF 33. After a hearing, the Court took the motion under advisement. ECF 47.

### STANDARD OF REVIEW

Summary judgment is appropriate when, based upon the record, "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute is "one that must be decided at trial because the evidence, viewed in the light most flattering to the nonmovant, would permit a rational factfinder to resolve the issue in favor of either party." *Medina-Munoz v. R.J. Reynolds Tobacco Co.*, 896 F.2d 5, 8 (1st Cir. 1990) (citation omitted). To prevail, the moving party must show that "there is no factual determination

which a 'rational factfinder' could make as to the 'existence or nonexistence' of a fact that 'has the potential to change the outcome of the suit.'" *Gibson Found., Inc. v. Norris*, 88 F.4th 1, 5 (1st Cir. 2023) (quoting *Borges ex rel. S.M.B.W. v. Serrano-Isern*, 605 F.3d 1, 4-5 (1st Cir. 2010)). Courts "must consider the record and the reasonable inferences drawn therefrom in the light most favorable to the nonmovant," but "need not credit 'conclusory allegations, improbable inferences, and unsupported speculation.'" *Dixon-Tribou*, 86 F.4th at 458 (quoting *Lahens v. AT&T Mobility Puerto Rico, Inc.*, 28 F.4th 325, 333 (1st Cir. 2022)). The non-moving party may not simply "rest upon mere allegation or denials," but instead must "present affirmative evidence." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256-57 (1986).

**DISCUSSION**

**I.      The Unearned Incentives.[2]**

The Massachusetts Wage Act "protect[s] employees and their right to wages by requiring employers to pay employees their wages in a timely fashion, according to the parameters set out in the statute." *Parker v. EnerNOC, Inc.*, 484 Mass. 128, 132 (2020) (citation and quotation marks omitted). The Act applies to commission payments, such as the incentive payments at issue here, "when the amount of such commissions, less allowable or authorized deductions, has been definitely determined and has become due and payable to such employee." M.G.L. c. 149, § 148, ¶ 4; *see Parker*, 484 Mass. at 135 n.11 (a commission is "a type of payment made based on a percentage of a sale"). Thus, two conditions must be met for commissions to be regarded as "wages" under the Act: (1) the amount of the commissions must have been "definitely

---

[2] By relying exclusively on Massachusetts law in briefing and arguing this diversity case, the parties convey their "agree[ment] that the law of Massachusetts controls" the Wage Act claim at issue, and the Court "accept[s] that reasonable agreement." *Klauber v. VMware, Inc.*, 80 F.4th 1, 10 (1st Cir. 2023).

determined," and (2) the commissions must have "become due and payable." *Klauber v. VMware, Inc.*, 80 F.4th 1, 10-11 (1st Cir. 2023) (quotation marks omitted).

The Court will assume, without deciding, that Rivard's Unearned Incentives have been "definitely determined." Even so, NICE is entitled to summary judgment on her Wage Act claim because Rivard's resignation ensured that the Unearned Incentives have not become "due and payable." In general, an employee "earns [a] commission and it becomes due and payable when the employee closes [a] sale, even if there is a delay in actual payment on the sale." *McAleer v. Prudential Ins. Co. of Am.*, 928 F. Supp. 2d 280, 289 (D. Mass. 2013). But this default rule "is not a fixed part of the 'due and payable' calculus: an employer and an employee may agree to different terms, thus modifying or eliminating the default rule." *Klauber*, 80 F.4th at 11. And when "a compensation plan specifically sets out the contingencies an employee must meet to earn a commission, courts apply the terms of the plan." *McAleer*, 928 F. Supp. 2d at 289; *accord Klauber*, 80 F.4th at 11. Where, as here, the compensation plan agreed to by the parties has contingencies, the employee is entitled to the commission only "'when any contingencies relating to their entitlement have occurred.'" *Parker*, 484 Mass. at 134 (quoting *McAleer*, 928 F. Supp. 2d at 288).

In this case, payment of the Unearned Incentives was contingent on Invoicing that had not yet occurred and on Rivard's continued employment at NICE. Section 10.5.2 of the Plan provides: "For Participants who terminate from an Employer (voluntarily or involuntarily), Incentives and Bonuses will be calculated based upon Bookings and Invoicings through the last day of Plan participation. For the avoidance of doubt, Participants shall not earn any Incentives or Bonuses following termination from an Employer." ECF 35-4, § 10.5.2. This type of continued-employment contingency—where commission payments are tied to an employee's ongoing employment—can be an enforceable prerequisite for commissions to become due and payable. *See Parker*, 484 Mass.

8

at 136 n.13;³ *Fine v. Guardian Life Ins. Co. of Am.*, 589 F. Supp. 3d 139, 152-54 (D. Mass. 2022). But courts have distinguished between a contingency like this one and a condition that simply sets a schedule for payment of commissions, which typically may not be used by an employer to avoid payment of earned commissions. *Compare Israel v. Voya Institutional Plan Servs., LLC*, No. 15-cv-11914-ADB, 2017 WL 1026416, at *7 (D. Mass. 2017), *with Smith v. Unidine Corp.*, SUCV2015-3417, 2017 WL 4411249, at *4-5 (Mass. Super. July 25, 2017).

Rivard argues that the Plan's continued-employment condition is akin to the unenforceable payment-timing provision considered by this Court in *Israel v. Voya Institutional Plan Services, LLC*. The plan document in *Israel* provided that payments would be made three months after the month that the production activity relevant to the commission occurred, and that employees "should be actively employed . . . to receive payment." *Israel*, 2017 WL 1026416, at *2. After the plaintiff resigned, he was not paid commissions that he earned in the three months before his resignation. *Id.* at *3. The Court concluded these withheld commissions were subject to the Wage Act because the plaintiff "did the work to earn the commissions prior to his resignation, and the fact that it may have taken [the defendant] a few months to make a final calculation as to the exact amount of the commissions [was] not sufficient to take them outside the scope of the Wage Act." *Id.* at *7. "[T]o decide otherwise," the Court explained, "would be to permit, even encourage,

---

³ In *Parker*, the Supreme Judicial Court explained that "a contingency cannot be relied upon by an employer to create circumstances under which the contingency goes unfulfilled in order to deny a commission that otherwise would be due and payable to an employee." 484 Mass. at 136 n.13. So a "policy that conditions payment on continued employment cannot relieve an employer from the obligation of paying a commission where the employer terminates its employee in retaliation for complaining about wage violations in the first place." *Id.* at 136. This case involves a wage nonpayment claim arising from Rivard's voluntary resignation, not a retaliation claim concerning an employer "set[ting] a condition under which it agree[d] to pay wages to an employee and then ma[de] it impossible for the employee to satisfy the condition in an effort to evade its responsibility to pay those wages." *Id.* at 134 n.10; *see Klauber*, 80 F.4th at 11 n.3.

employers to evade the law by imposing lengthy delays on the payment of commissions and conditioning the payments on continued employment." *Id.*

NICE responds that Section 10.5.2 of the Plan is more like the contingency in the sales commission and bonus plan at issue in *Smith v. Unidine Corporation*. There, the Massachusetts Superior Court enforced the terms of a plan providing that commissions are "earned ratably" over a twelve-month period, and that plan participants must remain employed in order to earn commissions. *Smith*, 2017 WL 4411249, at *1-2, *4-5. Because "commissions were 'earned' by the [plaintiff] each month as he performed or was available to perform services in aid of the [sales] contract," and because the plaintiff had ongoing maintenance responsibilities in connection with the sales contract, the continued-employment contingency was meaningfully distinct from the provision in *Israel* that concerned only the timing of commissions payments. *See Smith*, 2017 WL 4411249, at *5.

NICE contends that the Plan likewise imposed ongoing responsibilities on Rivard, and she could not perform those responsibilities related to her Unearned Incentives after she left NICE. The Court agrees. Viewed as a whole, the Plan is more like the plan considered in *Smith* than in *Israel*. Section 2 of the Plan specified that Participants like Rivard "continue[d] to have responsibilities after a Purchase Order [wa]s accepted by a Company to assist in resolving Customer issues until payment [wa]s made by the Customer and a full transition [wa]s made to that Company's Services Organization." ECF 35-4, § 2; *see* ECF 39, ¶ 15. And the record shows that after booking a sale, Rivard had ongoing responsibilities to transition customers between the sales and services teams and to work to prevent De-Booking. Rivard and Taliancich noted that Rivard's transitioning duties included collaborating with her coworkers "to address any questions or concerns that the customer raised with respect to the product that had been sold to the customer"

and participating in transition calls, generally in the two weeks following Booking, though possibly for longer periods of time. ECF 35-2, ¶¶ 7-8; ECF 39-2, at 47-48. Rivard and Taliancich also agreed that if the threat of a De-Booking arose, Rivard would attend meetings, work with colleagues to understand the customer's decisions, and try to convince the customer not to De-Book. ECF 39-2, at 44, 77; ECF 35-2, ¶ 9. On at least one occasion, Rivard recounted "helping behind the scenes" to try "to keep [a deal] active" when a De-Booking threatened a deal booked a year in advance. ECF 39-2, at 106, 110-13; ECF 39, ¶ 51.

Accordingly, the continued-employment contingency was more than a mere timing provision, because the Plan imposed ongoing substantive obligations on Rivard before she could earn her Unearned Incentives. ECF 39, ¶ 10. Viewing the record in the light most favorable to Rivard, there is no genuine dispute that, under the Plan, Rivard had responsibilities after Booking and before full Invoicing. As in *Smith*, some of her "commissions were 'earned' . . . as [she] performed or was available to perform services in aid of the [sales] contract." *Smith*, 2017 WL 4411249, at *5. Since Rivard's voluntary resignation made it impossible for her to perform or be available to perform that work, the Plan's condition of continued employment is enforceable. In accordance with that provision, the Unearned Incentive payments at issue had not become "due and payable" when Rivard resigned from NICE and are not, therefore, subject to the Wage Act.

## II.     Rivard's Additional Claims.

Rivard separately contends that the Court should deny summary judgment because during discovery, she uncovered three additional Wage Act violations that occurred while she was employed at NICE. These alleged violations concern three improper deductions that do not relate to the calculation of Incentive payments upon termination of employment. *See* ECF 38, at 6-7. Rivard's complaint did not raise these claims and challenged only NICE's practices pertaining to

the Unearned Incentives allegedly owed following her resignation. *See* ECF 1-1, at 7, ¶¶ 8-11 (alleging that when Rivard discussed her resignation with Human Resources at NICE, she was told that "all the commissions that [she] had earned through her last day would be paid to her" and that Rivard "is aware that she has earned . . . outstanding commission[s] in the amount of almost $60,000 that was not paid on her last day"). NICE protests, and the Court agrees, that Rivard "may not 'raise new and unadvertised theories of liability for the first time in opposition to a motion for summary judgment.'" *Miranda-Rivera v. Toledo-Dávila*, 813 F.3d 64, 76 (1st Cir. 2016) (quoting *Calvi v. Knox Cnty.*, 470 F.3d 422, 431 (1st Cir. 2006)). "Allowing a plaintiff to proceed on new, unpled theories after the close of discovery would prejudice defendants, who would have focused their discovery efforts on the theories actually pled." *Id.*

Rivard claims that because she "made no secret of her intent to seek relief for these violations of the Wage Act and supplemented her interrogatories to demonstrate the same," NICE "cannot claim surprise on this issue." ECF 38, at 16. But the First Circuit has made clear that amendment of a complaint may not occur "'through argument in a brief opposing summary judgment,'" and instead should be channeled through Federal Rule of Civil Procedure 15(a), which governs amendments to pleadings. *Asociación de Suscripción Conjunta del Seguro de Responsabilidad Obligatorio v. Juarbe-Jiménez*, 659 F.3d 42, 53 (1st Cir. 2011) (quoting *Gilmour v. Gates, McDonald & Co.*, 382 F.3d 1312, 1315 (11th Cir. 2004)); *see also Martinez v. Petrenko*, 792 F.3d 173, 180 (1st Cir. 2015) (rejecting plaintiff's argument that "his change did not present a change in a 'theory of liability,' because he consistently argued that [the defendant] was liable for unpaid overtime under the [Fair Labor Standards Act]—all that changed was [his] theory of why he should enjoy the [Act's] protections in the first place"). Rivard could have sought leave to amend her complaint pursuant to Rule 15(a) to add these allegations, but she did not do so. It is

now a year and a half after the deadline for amending the pleadings. Rivard has made no showing of "'good cause'" for this delay, and her eleventh-hour attempt to add claims to her complaint by procedurally improper means must be denied. *See Martinez*, 792 F.3d at 180 (quoting Fed. R. Civ. P. 16(b)(4)).

## CONCLUSION AND ORDER

For the foregoing reasons, the defendant's motion for summary judgment, ECF 33, is GRANTED.

SO ORDERED.

/s/ Julia E. Kobick
JULIA E. KOBICK
UNITED STATES DISTRICT JUDGE

Dated: August 20, 2025